VINCENT CELENTANO ET AL. *v.* OAKS
CONDOMINIUM ASSOCIATION ET AL.
(SC 16684)

Borden, Norcott, Katz, Palmer and Zarella, Js.

580

Argued January 8—officially released September 2, 2003

*Dina S. Fisher*, with whom was *Patrick J. Sweeney*, for the appellants-appellees (defendants).

*Paul M. Sabetta*, for the appellees-appellants (plaintiffs).

*Opinion*

KATZ, J. This appeal and cross appeal[1] arise out of an action by the plaintiffs,[2] lessors of the land underlying the Oaks condominium complex (Oaks), against the defendants, the Oaks Condominium Association (association) and the members of its board of directors,[3] alleging that the defendants had violated their obligations under the lease for the underlying land (ground lease)[4] and seeking an accounting of rents due and

---

[1] The defendants appealed and the plaintiffs cross appealed from the trial court's judgment to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[2] The original plaintiffs to this action were Vincent Celentano, Lawrence I. Levy, Marvin R. Leventhal and Richard A. LoRicco. Mary Celentano subsequently was added as a substitute party plaintiff as a successor in interest to Vincent Celentano.

[3] The following members of the association's board of directors were named as defendants: Carol Beers, Edward Wheeler, Carolyn Newton, Linda Masvidal, Maureen Bell, James Sweetman, Charles Lohrenz, Susan Smolen, Pam Moffitt, Tyrone Griffin, Roberta Brooks and Wally Roberts.

[4] There actually were two ground leases executed by the parties, one for each of two parcels of land.

damages for allegedly unlawful conduct pertaining to the collection and payment of rent. The defendants asserted several special defenses, including that the ground lease could not be enforced because the "hybrid" condominium form of the Oaks, in which the building units are owned and the underlying land is leased, violated the Condominium Act of 1976 (condominium act), General Statutes § 47-68a et seq. The defendants also filed a counterclaim, seeking to invalidate the ground lease, to obtain title to the land and to recover certain rental payments made to the plaintiffs. The trial court rendered partial judgment in favor of the plaintiffs, awarding damages for, inter alia, rents and interest due under the terms of the ground lease and the cost of the accounting to determine the amount due. The trial court also awarded the defendants damages based on its determination that the plaintiffs had breached the duty of good faith and fair dealing. The defendants appeal and the plaintiffs cross appeal from the trial court's judgment. We affirm the judgment of the trial court.

The record reflects the following facts and procedural history. The plaintiffs owned two parcels of real property, located at 79 and 80 Claudia Drive in West Haven, on which two apartment buildings were situated. In 1982, the plaintiffs sold the buildings to Melrose Apartments, Inc. (Melrose). The plaintiffs concurrently executed a ground lease whereby they conveyed to Melrose a leasehold interest in the underlying land for a term of ninety-nine years, with an escalating rent schedule, plus an option to purchase. In November, 1982, Melrose thereafter, as set forth under the terms of the ground lease, declared a condominium, named the Oaks, in the two properties, consisting of 108 units in total. Pursuant to a "Deed of Condominium Unit and Assignment of Leasehold Interest" (deed), purchasers of the individual condominium units received a fee simple absolute inter-

est in their unit and an assignment of a fractional interest in the underlying ground lease. The purchasers also received, in accordance with the deed and the ground lease, a purchase option for their leasehold interest that could be exercised collectively by the unit owners in the eleventh year of the lease. Unit owners individually were responsible for the rent payments to the plaintiffs, although the unit owners actually made these payments to the association, which in turn remitted the payments to the plaintiffs.

In the early 1990s, the defendants began inquiring about exercising the purchase option. In a January, 1993 letter, the defendants asked the plaintiffs to indicate a purchase price and the time frame within which the purchase option could be exercised. The plaintiffs responded by letter that they would not "presume to advise [the defendants] as to what is 'the period within which to exercise said options.'" On April 2, 1993, the defendants sent a letter to the plaintiffs stating that they wanted to exercise the purchase option and identifying the purchase price as $416,000. On April 7, 1993, the plaintiffs responded to the defendants' April 2 letter, noting the defendants' intention to exercise the purchase option, but indicating that the price offered was too low.

On June 16, 1993, the defendants filed a demand for arbitration with the American Arbitration Association, seeking a "valuation of an option to purchase a land lease for premises commonly known as 79 and 80 Claudia Drive, West Haven . . . and issues ancillary thereto," including the issue of whether the option had been exercised timely. In response, the plaintiffs filed an action in Superior Court seeking to enjoin the arbitration. In October, 1994, the trial court, *Booth, J.*, rendered judgment in favor of the plaintiffs on the ground that the value of the land was the only issue that could be

arbitrated pursuant to General Statutes § 52-408,[5] as it was the only issue that the parties had agreed in writing to arbitrate. The issue of whether the option had been exercised timely was not subject to arbitration under the ground lease; therefore the court enjoined the defendants from pursuing arbitration on that matter.

While the action to enjoin the arbitration was pending before the trial court, the defendants sent two more letters to the plaintiffs, dated December 16, 1993, and May 4, 1994, again indicating that they wanted to exercise the purchase option. The plaintiffs did not respond to either letter.

In 1995, the defendants began withholding the rents due under the terms of the ground lease and depositing them in an escrow account. This action stemmed from the determination by the property manager of the Oaks that the association had been overpaying ground rents to the plaintiffs, because the association had been paying the full amount due under the ground lease and not deducting amounts not collected from unit owners who were delinquent in making rent payments. Some of the ground rents withheld were used by the defendants to pay back property taxes due and to make capital improvements to the common elements of the Oaks.

As a result of the association's refusal to remit all the rent payments due, the plaintiffs brought this action.

---

[5] General Statutes § 52-408 provides: "An agreement in any written contract, or in a separate writing executed by the parties to any written contract, to settle by arbitration any controversy thereafter arising out of such contract, or out of the failure or refusal to perform the whole or any part thereof, or a written provision in the articles of association or bylaws of an association or corporation of which both parties are members to arbitrate any controversy which may arise between them in the future, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable and enforceable, except when there exists sufficient cause at law or in equity for the avoidance of written contracts generally."

In their third amended revised complaint, the plaintiffs alleged that the defendants: (1) wrongfully had withheld ground rent and taxes due under the terms of the ground lease; (2) had been negligent in the manner in which they undertook their duties to collect rents from the unit owners; (3) should be ordered to furnish an accounting of the rent payments held in escrow; (4) had converted the rents collected to their own use; and (5) had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendants asserted several special defenses, including, inter alia, that the condominium had not been created legally in accordance with the condominium act. The defendants also filed a counterclaim, alleging that: (1) title to the land underlying the Oaks should be quieted by declaring the association the owner of the property; (2) the plaintiffs had been unjustly enriched by ground lease payments they had received after a certain date; (3) the defendants were entitled to specific performance on the purchase option in the lease; (4) the lease was presumptively unconscionable pursuant to General Statutes § 47-210; (5) the plaintiffs had breached the covenant of good faith and fair dealing; (6) the plaintiffs had violated CUTPA; and (7) the plaintiffs' actions had constituted conversion.

Thereafter, the defendants filed a motion for summary judgment on their special defense that the Oaks was an illegally formed condominium, which motion was denied by the trial court. After a bench trial, the court rendered partial judgment for the plaintiffs. Specifically, the court rejected the defendants' claim that the ground lease was unconscionable and, accordingly, awarded the plaintiffs past and future rents due under the lease and ordered the defendants to provide an accounting for rents they had collected but had not remitted to the plaintiffs. The trial court also concluded that the defendants were time barred from enforcing

their purchase option through specific performance, but awarded the defendants damages based on its finding that the plaintiffs had breached the duty of good faith and fair dealing in their conduct toward the defendants when they had attempted to exercise the purchase option. The trial court rejected the parties' remaining claims. This appeal and cross appeal followed. Additional facts will be set forth as necessary.

The parties each raise several claims for our consideration on appeal. In their appeal, the defendants claim that the trial court improperly concluded that: (1) the Oaks was a legally created condominium pursuant to the condominium act; (2) the ground lease was not presumptively unconscionable pursuant to § 47-210; and (3) the defendants were not entitled to specific performance on the purchase option because the applicable limitations period under General Statutes § 47-33a was not tolled by the doctrine of equitable estoppel.[6] The plaintiffs, in their cross appeal, claim that the trial court improperly refused to award them attorney's fees, as provided for in the ground lease, and improperly awarded the defendants damages for the plaintiffs' breach of the covenant of good faith and fair dealing in the absence of sufficient evidence to support such a finding.[7] We reject all the claims, on both the appeal and the cross appeal and, accordingly, affirm the judgment of the trial court.

---

[6] The defendants also raised a statute of frauds claim with regard to the ground lease in their reply brief. We generally do not consider issues raised for the first time in a reply brief. See, e.g., *Bovat* v. *Waterbury*, 258 Conn. 574, 585 n.11, 783 A.2d 1001 (2001) ("[i]t is a well established principle that arguments cannot be raised for the first time in a reply brief" [internal quotation marks omitted]). We, therefore, decline to review this claim.

[7] The plaintiffs also set forth two alternate grounds for affirmance and two issues to be considered in the event of a remand. Because we affirm the judgment of the trial court, we need not address these issues.

I

The defendants' claims turn on our construction of various provisions of the condominium act and § 47-210. Issues of statutory construction raise questions of law, over which we exercise plenary review. *Commissioner of Transportation* v. *Kahn*, 262 Conn. 257, 272, 811 A.2d 693 (2003). "The process of statutory interpretation involves a reasoned search for the intention of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of this case, including the question of whether the language actually does apply. In seeking to determine that meaning, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Spears* v. *Garcia*, 263 Conn. 22, 27–28, 818 A.2d 37 (2003). With these principles in mind, we turn to the defendants' claims.

A

We first address the defendants' claim that the trial court improperly concluded that the Oaks is a legally formed condominium under the condominium act. This claim is premised on the defendants' contention that, although the condominium act permits the creation of *either* a pure fee simple condominium *or* a pure leasehold condominium, it prohibits the creation of a hybrid of a fee simple interest in the units and a leasehold interest in the land. On the basis of that premise, the defendants proffer several arguments as to why the Oaks fails to conform to either of the two permissible forms of condominiums, from which we discern two basic contentions: (1) the trial court improperly con-

cluded that the Oaks was a validly formed leasehold condominium, because certain procedural and substantive requirements necessary to establish a leasehold condominium under General Statutes § 47-68a (cc)[8] had not been satisfied; and (2) the property was not submitted properly to the condominium form of ownership because Melrose, the declarant of the condominium, was not the fee owner of both the buildings and the land.[9] We reject the defendants' claims.

---

[8] General Statutes § 47-68a (cc) provides: " 'Leasehold condominium' means property submitted to the provisions of this chapter by the fee owner, whereby unit leases are issued for a period not less than fifty years and provided, in a residential leasehold condominium, such lease provides that the lessee shall have the option to purchase the fee simple title to the demised property during the term of the lease at a price stated or by a method stated for subsequent determination of the total price."

[9] The defendants also claim that the Oaks is not a lawful condominium because, upon expiration of the ninety-nine year lease, the land underlying the Oaks will revert to the plaintiffs, which the defendants contend is not a reasonable or viable outcome. Specifically, the defendants contend that the reversion will create conflicting ownership interests between the plaintiffs and the unit owners. We first note that the defendants assert as support for this claim certain principles of statutory construction without referencing *any* statute that supposedly would be violated were we to find the lease agreement reasonable. Moreover, our review of the record reveals that the defendants failed to raise this claim before the trial court. "We have stated repeatedly that we ordinarily will not review an issue that has not been properly raised before the trial court." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 846 n.1, 817 A.2d 683 (2003); *Bell Atlantic Mobile, Inc.* v. *Dept. of Public Utility Control*, 253 Conn. 453, 485, 754 A.2d 128 (2000). Therefore, we need not address this claim.

The defendants also contend that the lease interferes with the unit owners' right to the common elements in violation of General Statutes § 47-74 (b). Our review of the record reveals that the defendants never pleaded § 47-74 (b) as a special defense, nor did they refer to § 47-74 (b) in their motion for summary judgment. The first time the defendants addressed this statute was in their reply to the plaintiffs' motion in opposition to the defendants' motion for summary judgment. The trial court did not address this issue in its memorandum of decision, nor did the defendants file a motion for articulation asking the trial court to do so. "[B]ecause our review is limited to matters in the record, we will not address issues not decided by the trial court. Practice Book § 4185 [now § 60-5] (court on appeal shall not be bound to consider a claim unless it was distinctly raised at the trial); *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996)

The following additional facts and procedural history are relevant to our resolution of the defendants' claims. In a motion dated August 14, 2000, the defendants moved for summary judgment on the ground that the condominium declaration creating the Oaks was unlawful, and, therefore, the plaintiffs' claims failed as a matter of law. Specifically, the defendants contended that the hybrid condominium form of the Oaks, a fee interest in the units and a leasehold interest in the land, was not authorized by the condominium act.

In its memorandum of decision, the trial court found the following undisputed material facts relevant to the defendants' motion. "[O]n November 30, 1982, Melrose declared a condominium consisting of its leasehold interest in the land and its ownership of the building[s]. Melrose issued a Declaration of Condominium dated November 30, 1982, that defines the property being declared to be a condominium as '[t]he leasehold interest of the Declarant in and to that piece or parcel of land situated at 79 Claudia Drive, West Haven . . . and more particularly described in Schedule A attached hereto, the buildings, all improvements and structures thereon, and rights and appurtenances belonging thereto.' The declaration defines a 'unit owner' as 'the person or persons owning a Unit in fee simple absolute, or leasing a unit as hereinafter provided, and an undivided interest in the fee simple or leased estate of the common areas and facilities in the percentage specified in this Declaration.'

"Melrose sold units in the building at 79 Claudia Drive to purchasers by way of a document titled 'Deed of Condominium Unit and Assignment of Leasehold Interest.' The property conveyed in the deed to each unit

(claims neither addressed nor decided by court below are not properly before appellate tribunal)." (Internal quotation marks omitted.) *State* v. *Nunes*, 260 Conn. 649, 658, 800 A.2d 1160 (2002). We, therefore, decline to review this claim as well.

owner was '[t]he following described Leasehold Estate and Real Property with appurtenances thereto located in the Town of West Haven . . . known as Unit [number] of The [Oaks], An Expandable Condominium, together with an undivided 1.76 (%) percent interest in the common elements and appurtenant thereto, and all of the right, title and interest of the Grantor in and to a 1.76 (%) percent and fractional interest in and to a certain leasehold estate created pursuant to the terms and conditions of a certain Ground Lease by and between [the plaintiffs] and [Melrose] dated the 30th day of November, 1982 . . . .'

"The lease referred to in the deeds issued to unit owners provided for a lease term of ninety-nine years. The lease further provided that the unit owners collectively could purchase the land to which the lease applied at a juncture eleven years after the execution of the lease, for the lesser of the current appraised market value of the land or [13] percent of the then current appraised market value of the land and improvements, with an arbitration procedure to resolve disagreements as to value."

On the basis of these facts, the trial court considered the defendants' legal claim and denied their motion for summary judgment. The trial court examined the definitional and substantive provisions of the condominium act, as well as its legislative history, and concluded that, when read in its entirety, the condominium act permitted the creation of the "hybrid" condominium, meaning one that combines a fee simple interest in a unit with an undivided leasehold interest in the land on which the condominium is situated. Specifically, the trial court noted that the condominium act preserved the differentiation between leasehold condominiums and fee simple condominiums and that the act would not have provided for the conveyance of leasehold interests if such interests were prohibited. Moreover, the

trial court noted that the condominium act as originally enacted authorized such transactions and that the act's subsequent history evinced no intention to preclude them. Accordingly, the trial court denied the defendants' motion for summary judgment.

1

We first consider whether the condominium act precludes the creation of a hybrid condominium, in which a unit owner receives a fee simple interest in his or her unit and an undivided leasehold interest in the underlying land. The defendants contend that the condominium act permits only pure fee simple condominiums *or* pure leasehold condominiums. Specifically, the defendants contend that § 47-70 (d) prohibits the conveyance of a property interest less than fee simple absolute and, therefore, a condominium lawfully cannot be created whereby a unit owner receives a fee interest and a leasehold interest. We disagree that the condominium act evinces an intention to preclude such hybrid condominiums.

We begin with certain basic principles in mind. It is well settled that compliance with the requirements of the condominium act is "a condition precedent to attaining condominium legal status . . . ." *Hall Manor Owner's Assn.* v. *West Haven,* 212 Conn. 147, 153, 561 A.2d 1373 (1989). A condominium, as defined by General Statutes § 47-68a (a), is "real property and any incidents thereto and interests therein, lawfully submitted to this chapter by the recordation of condominium instruments pursuant to the provisions of this chapter." The condominium act sets forth requirements that the declaration contain particular information; General Statutes § 47-70; and that it must be recorded in accordance with certain procedures. General Statutes § 47-71. Neither of these provisions contain an express prohi-

bition on the type of hybrid condominium created by the Oaks.

We recognize, however, that § 47-70 (d), on which the defendants rely, appears to suggest, at first blush and when read in isolation, that such a hybrid condominium may not be permitted. That subsection provides in relevant part that "[t]he property submitted to a condominium declaration pursuant to this chapter, other than a nonresidential condominium, shall be conveyed by the declarant to purchasers *in fee simple absolute*, subject only to covenants, easements and liens, limited as follows . . . (3) Mutually beneficial property restrictions which would be enforceable by other owners in the subdivision or project of which the condominium is a part for more than five years after the first declaration in a planned project. Such restrictions shall not give declarant or any other person more power per unit owned than that which is proportionately equal to his fraction of the number of similar units planned or constructed in such subdivision or project, *and the property shall not be subject to leasehold or reversionary interest.*" (Emphasis added.) General Statutes § 47-70 (d). The condominium act further provides that " '[p]roperty' means and includes the land, all buildings, all improvements and structures thereon, and all easements, rights and appurtenances belonging thereto, which have been or are intended to be submitted to the provisions of this chapter." General Statutes § 47-68a (*l*). In the defendants' view, these provisions indicate that condominiums must be conveyed entirely in fee simple and cannot include a conveyance of a leasehold interest.

A closer review of § 47-70 (d), particularly in the context of the condominium act in its entirety, evinces no such restriction. Section 47-70 (d) simply provides that, when a conveyance is made of a fee simple interest, *that* fee simple interest cannot be subject to a leasehold

or reversionary interest. In the present case, a fee simple interest in the building units was conveyed by deed, *unencumbered by any leasehold interest*. A separate leasehold interest was assigned in the underlying land.

The limitation in § 47-70 (d) is consistent with, and may be explained by reference to, General Statutes § 47-88b, which addresses situations in which an apartment building is converted to condominiums, a not uncommon occurrence. Under this section, tenants of such buildings are given the right to purchase the unit that they currently are renting. General Statutes § 47-88b (b) and (c). Any tenants who choose not to exercise that option, "shall be entitled to remain in the premises under their existing leases . . . except that upon the filing of the declaration said lease shall be considered assigned to the declarant." General Statutes § 47-88b (c). Thus, a declarant of a condominium may have fee simple title to such units, upon the conversion from apartments to condominiums, but the declarant may not convey fee simple title to new owners for units that are subject to leases still in force.

Moreover, it is clear that § 47-70 is not intended to prescribe the types of condominiums that are permitted under the condominium act. There is no reference in that section to condominiums that are subject to any leasehold interest. Section 47-68a (cc), however, expressly provides for a "leasehold condominium," which is defined as "property submitted to the provisions of this chapter by the fee owner, whereby unit leases are issued for a period not less than fifty years and provided, in a residential leasehold condominium, such lease provides that the lessee shall have the option to purchase the fee simple title to the demised property during the term of the lease at a price stated or by a method stated for subsequent determination of the total price." Indeed, the terms leasehold interest and lease are referenced throughout the condominium act. See,

e.g., General Statutes §§ 47-68a (m), 47-71 (h), 47-71b, 47-72 and 47-79. Accordingly, it is clear that § 47-70 was not intended to prescribe the types of condominiums that may be created.

Reference to other provisions reveal that hybrid condominiums are not inconsistent with the condominium act. Specifically, General Statutes § 47-79 (a), which addresses tax liability, provides in part that "[i]n the event the land *or* the building, including common areas and facilities, *is separately owned, and leased to the unit owner* for a period of not less than fifty years and such lease, duly recorded, provides that the lessee shall pay all such taxes, such unit and its percentage of undivided interest in the common areas and facilities shall be deemed to be a parcel and shall be separately assessed and taxed in the name of the lessee." (Emphasis added.) By using the disjunctive in referring to the land "or" the building, this subsection indicates that either may be leased independently to the unit owner, regardless of the status of the concomitant interest. Indeed, because a unit owner is defined as one who has either a leasehold interest or a fee interest in his unit; General Statutes § 47-68a (c);[10] and § 47-79 further provides that the building or the land may be "separately owned, and leased to the unit owner," this language encompasses three possible arrangements: (1) a unit owner may lease both his unit and an interest in the underlying land from two different parties who separately own the land and the building; (2) a unit owner may purchase a leasehold interest in his unit from one party and a fee interest in the land from another party; or (3) a unit owner may purchase a fee interest in his

---

[10] General Statutes § 47-68a (c) defines a "unit owner" as "the person or persons owning a condominium unit or leasing a unit in a leasehold condominium, as hereinafter provided, and an undivided interest in the common elements specified and established in the declaration and the heirs, executors, administrators, successors and assigns of such person or persons, and a mortgagee or lienholder holding both legal and equitable title."

unit from one party and a leasehold interest in the underlying land from another party, as is provided for in the Oaks condominium. Therefore, hybrid forms of condominiums are consistent with § 47-79.

We also find support in General Statutes § 47-74c,[11] which prohibits the declarant of the condominium from retaining an ownership interest in any recreational facilities[12] and leasing the right to use such facilities back to the unit owners. The condominium act contains no comparable prohibition on a declarant retaining an ownership interest in the land underlying the recreational facilities and leasing such land back to unit owners. "[W]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed." (Internal quotation marks omitted.) *Doe* v. *Marselle*, 236 Conn. 845, 861, 675 A.2d 835 (1996). Accordingly, we presume that, had the legislature intended to prohibit a declarant from retaining ownership of land underlying the recreational common area and leasing it back to the unit owners, it would have indicated such intent, as it did with regard to the recreational facilities themselves. Furthermore, we have found nothing in the legislative history of the condominium act to indicate that the legislature intended to preclude the creation of hybrid leasehold/fee simple condominiums, in which the land is leased to unit owners.

---

[11] General Statutes § 47-74c provides in relevant part: "The declarant shall not retain ownership of, and lease or otherwise require payment for the use of the recreation facilities nor shall the declarant convey such recreation facilities to any person other than to the unit owners of the condominium served by such recreation facilities, which shall be common elements of the condominium within which they are located or which they serve . . . ."

[12] General Statutes § 47-68a (f) defines "[r]ecreation facilities" as "that portion of the common elements intended for recreational, social and similar community use by the unit owners."

In sum, we recognize that the condominium act is not a model of clarity; it contains neither an express prohibition of *nor* authorization for hybrid condominiums of a leasehold and fee simple interest. We conclude, however, that such hybrids are not inconsistent with the provisions of the condominium act. Accordingly, the act does not reflect clearly the legislature's intent in this regard. In light of this uncertainty as to legislative intent, subsequent legislative action expressly directed toward this type of condominium informs our resolution of this issue. See *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 541, 494 A.2d 555 (1985) (noting that, although Workers' Compensation Act postdated statute at issue, "a subsequent legislative act 'may throw light on the legislative intent of a former related act' "); *Baker* v. *Norwalk*, 152 Conn. 312, 317, 206 A.2d 428 (1965) ("subsequent legislative act may throw light on the legislative intent of an earlier related act"); see also *In re Valerie D.*, 223 Conn. 492, 518 n.19, 613 A.2d 748 (1992) (noting our reluctance to rely on subsequent legislative action as indicative of earlier intent, but concluding that, under facts of case, it was "sufficient foundation for an inference regarding legislative intent").

In 1995, the legislature amended the Common Interest Ownership Act; General Statutes § 47-200 et seq., which originally was enacted in 1983 and most of which was effective January 1, 1984; specifically to remedy problems arising from unconscionable lease agreements in condominiums and other residential common interest communities created prior to 1984. See Public Acts 1995, No. 95-187, § 27. The legislative debates on the Common Interest Ownership Act reflect concerns expressly addressing problems attendant to the Oaks type of hybrid condominium. Senator Martin Looney stated that "the issue of unconscionable ground leases . . . is something that has become a problem in a number of communities in the state . . . where

the situation has arisen whereby a long-term ground lease with an escalating clause has created a very difficult and punitive situation for the people who own the units but not the ground under them and has rendered those units unmarketable." 38 S. Proc., Pt. 13, 1995 Sess., pp. 4733–34. Indeed, Senator Looney expressly referred to West Haven, where the Oaks is located, as one such community. Id. The concern with respect to this type of hybrid condominium is evinced in the Common Interest Ownership Act, particularly in § 47-210 (a). That subsection provides in relevant part: "The General Assembly expressly finds that *many leases involving the use of land or recreational or other common facilities* by residents of a residential common interest community were entered into by parties wholly representative of the interests of a residential common interest developer at a time when the residential common interest community unit owners not only did not control the administration of their residential common interest community, but also had little or no voice in such administration. Such leases often contain numerous obligations on the part of either or both a residential common interest community association and residential common interest community unit owners with relatively few obligations on the part of the lessor. Such lease may or may not be unconscionable in any given case. Nevertheless, the General Assembly finds that a combination of certain onerous obligations and circumstances warrants the establishment of a rebuttable presumption of unconscionability of certain leases, as specified in subsection (d) of this section. . . ." (Emphasis added.) General Statutes § 47-210 (a). This language, consistent with § 47-79 (a), underscores the legislature's understanding that, under the law existing at the time, either the land or the building could be leased to unit owners.

It is noteworthy that, despite its recognition of the existence of problems associated with this form of con-

dominium, the legislature did not preclude the forma-
tion of such hybrids. Rather, it chose to address the
problem when it amended § 47-210, setting forth certain
factors that establish a presumption of unconscionabil-
ity and precluding time-related affirmative defenses for
claims relating to pre-1984 leases. See Public Act 95-
187, § 27, and footnote 14 of this opinion. It is evident
that, in keeping with the concerns that motivated the
legislature to provide for such protections, a unit owner
with a leasehold/fee simple interest would be an
intended beneficiary. Indeed, a unit owner who leases
both his unit and an interest in the underlying land
simply could walk away from the oppressive lease, sub-
ject to minimal financial risk. The same cannot be said
for a unit owner who has a fee interest in his unit and
is subject to an oppressive ground lease. Accordingly,
in view of our conclusion that hybrid condominiums
are not inconsistent with the condominium act and in
light of the legislature's amendment of the Common
Interest Ownership Act to provide a remedy for prob-
lems arising under such arrangements, we conclude
that hybrid leasehold/fee simple condominiums are per-
mitted under the condominium act.

### 2

The defendants also claim that the trial court improp-
erly concluded that the Oaks was a validly formed lease-
hold condominium. Specifically, they contend that
procedural and substantive requirements of a leasehold
condominium, as set forth in § 47-68a (cc), were not
satisfied because: (1) no unit leases were issued; and
(2) unit owners do not have individually exercisable
purchase options for their interest in the underlying
land. This claim is predicated on the defendants' asser-
tion that the Oaks, if not a *pure* fee simple, must be a
leasehold condominium. In light of our conclusion in
part I A 1 of this opinion that the condominium act

does not preclude hybrid condominiums, we need not address these claims at great length.

We first note that, contrary to the defendants' contention, the trial court did not base its denial of the defendants' motion for summary judgment on a conclusion that the Oaks is a leasehold condominium, as that term is defined under § 47-68a (cc). See footnote 8 of this opinion. Although the court used the term "leasehold condominium" with some frequency in its memorandum of decision, our review of the decision in its entirety reflects that the court merely looked to § 47-68a (cc) and various other provisions addressing leases and leasehold interests to support its conclusion that the condominium act did not prohibit the creation of such interests and, therefore, did not preclude the creation of a condominium comprised of both a fee and leasehold interest. Indeed, the court repeatedly referred to "leasehold interests" and "condominiums on leased land."

More important, as we previously have noted, a leasehold condominium is defined as "property submitted to the provisions of this chapter by the fee owner, *whereby unit leases are issued* for a period not less than fifty years and provided, in a residential leasehold condominium, such lease provides that the lessee shall have the option to purchase the fee simple title to the demised property . . . ." (Emphasis added.) General Statutes § 47-68a (cc). Although the term "unit lease" is not defined under the condominium act, reference to the definition of "unit"; see General Statutes § 47-68a (b);[13] makes evident what a commonsense construction of the statute would dictate—that a "unit lease" is

[13] General Statutes § 47-68a (b) provides: " 'Unit' means a part of the property including one or more rooms or designated spaces located on one or more floors or a part or parts thereof in a building, intended for any type of independent use, and with a direct exit to a public street or highway or to common elements leading to such street or highway."

required only when the unit owner has a leasehold interest, not a fee simple interest, in his unit. In the present case, because the Oaks condominium units were conveyed in fee simple pursuant to a deed of sale, the Oaks is not a leasehold condominium. The defendants' related claim—that the Oaks is an unlawful condominium because the unit owners may not exercise their purchase option individually, as required for leasehold condominiums under § 47-68a (cc)—also fails. Applying the same commonsense construction to this claim, it would be absurd even to contemplate individually exercisable purchase options in the underlying ground for each of the 108 unit owners. Indeed, it makes sense to have individually exercisable purchase options *only* when individual unit leases are involved. Accordingly, we reject the defendants' claim that the Oaks improperly failed to conform to the requirements for a leasehold condominium.

3

Finally, the defendants contend that the Oaks was not submitted to the condominium form of ownership in accordance with the condominium act. Specifically, the defendants contend that the act requires that both the units and the common elements be submitted by the fee owner, and that this requirement was not satisfied because the plaintiffs did not submit their fee interest in the land. Instead, the defendants note that Melrose submitted a fee interest in the building and a leasehold interest in the land. We conclude that the Oaks properly was submitted in accordance with the condominium act.

Once again, the defendants' claim is predicated on their assumption that the Oaks must comply with the requirements of a leasehold condominium under § 47-68a (cc). That term is defined in relevant part as "property submitted to the provisions of this chapter *by the*

*fee owner* . . . ." (Emphasis added.) General Statutes § 47-68a (cc). We assume, without deciding, that the property creating this hybrid condominium was required to be submitted by the fee owners and nevertheless conclude that this requirement was satisfied in the present case.

The plaintiffs' conduct clearly evinced their intention to submit their fee interest—a reversionary interest in the ground lease subject to the unit owners' option to purchase—to the condominium form of ownership. Article fourteen of the condominium declaration, entitled "Joinder By Lessor," provides that "[the plaintiffs], owners in fee simple of the property, do hereby consent to this Declaration." The plaintiffs' signatures on the declaration provide further evidence of their acquiescence to the interests submitted. The ground lease between Melrose and the plaintiffs is incorporated by reference into the declaration and the unit owners' deeds. That lease provides, inter alia, that the leasehold interest for a ninety-nine year term is "subject to the option granted [by the plaintiffs] to [Melrose] and the Condominium Unit Owners to purchase the Land as hereinafter set forth." The lease thereafter provides: "In the event that the option to purchase is exercised . . . the [plaintiffs] shall execute and deliver to the Condominium Unit Owners . . . a warranty deed to the Land showing the same to be free and clear of all encumbrances . . . ." In sum, the condominium documents clearly reflect that the plaintiffs consented to the submission of their reversionary interest in the land, so that unit owners lawfully could exercise their purchase option. Accordingly, we conclude that the Oaks was submitted to the condominium form of ownership by the fee owners in accordance with the condominium act.

## B

The defendants next contend that the trial court improperly concluded that the ground lease was not presumptively unconscionable pursuant to § 47-210.[14]

[11] General Statutes § 47-210 provides: "(a) The General Assembly expressly finds that many leases involving the use of land or recreational or other common facilities by residents of a residential common interest community were entered into by parties wholly representative of the interests of a residential common interest developer at a time when the residential common interest community unit owners not only did not control the administration of their residential common interest community, but also had little or no voice in such administration. Such leases often contain numerous obligations on the part of either or both a residential common interest community association and residential common interest community unit owners with relatively few obligations on the part of the lessor. Such lease may or may not be unconscionable in any given case. Nevertheless, the General Assembly finds that a combination of certain onerous obligations and circumstances warrants the establishment of a rebuttable presumption of unconscionability of certain leases, as specified in subsection (d) of this section. The presumption may be rebutted by a lessor upon the showing of additional facts and circumstances to justify and validate what otherwise appears to be an unconscionable lease under this section. Failure of a lease to contain the required number of specified elements shall not preclude a determination of unconscionability of the lease. It is the intent of the General Assembly that this section is remedial and does not create any new cause of action to invalidate any residential common interest community lease, but shall operate as a statutory prescription on procedural matters in actions brought on one or more causes of action existing at the time of the execution of such lease.

"(b) The court, on finding as a matter of law that a contract or contract clause was unconscionable at the time the contract was made, may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause or limit the application of any unconscionable clause in order to avoid an unconscionable result.

"(c) Whenever it is claimed, or appears to the court, that a contract or any contract clause is or may be unconscionable, the parties, in order to aid the court in making the determination, shall be afforded a reasonable opportunity to present evidence as to:

"(1) The commercial setting of the negotiations;

"(2) Whether a party has knowingly taken advantage of the inability of the other party reasonably to protect his interests by reason of physical or mental infirmity, illiteracy, inability to understand the language of the agreement or similar factors;

"(3) The effect and purpose of the contract or clause; and

"(4) If a sale, any gross disparity, at the time of contracting, between the

Specifically, the defendants contend that the trial court

amount charged for the property and the value of that property measured by the price at which similar property was readily obtainable in similar transactions. A disparity between the contract price and the value of the property measured by the price at which similar property was readily obtainable in similar transactions does not, of itself, render the contract unconscionable.

"(d) A lease entered into prior to January 1, 1984, pertaining to use of land or facilities by unit owners in a residential common interest community, is presumed to be unconscionable if:

"(1) The lease by its terms requires the lessee to pay an annual rental and other expenses that exceed fifteen per cent of the appraised value of the leased property as improved, provided for the purposes of this subdivision, 'annual rental and other expenses' means the amount paid by the lessee during the twelve months immediately preceding the filing of an action under this section as rent and for real estate taxes, insurance, capital improvements and other expenses required to maintain the property under the lease terms, and 'appraised value' means the appraised value placed upon the leased property by a licensed or certified real estate appraiser on a date during the twelve months immediately preceding the filing of an action under this section, and

"(2) Seven of the following eight elements exist:

"(A) The lease was executed by persons none of whom at the time of the execution of the lease were elected by unit owners, other than the declarant;

"(B) The lease requires either the association or the unit owners to pay all real estate taxes on the subject real property;

"(C) The lease requires either the association or the unit owners to insure buildings or other facilities on the subject real property against fire or any other hazard;

"(D) The lease requires either the association or the unit owners to perform some or all maintenance obligations pertaining to the subject real property or facilities located upon the subject real property;

"(E) The lease requires either the association or the unit owners to pay rents to the lessor for a period of twenty-one years or more;

"(F) The lease provides that failure of the lessee to make payments of rents due under the lease creates, establishes or permits establishment of a lien upon individual units to secure claims for rent;

"(G) The lease provides for a periodic rental increase based upon reference to a price index; and

"(H) The lease or other common interest community documents require that any transferee of a unit must assume obligations under the lease.

"(e) The presumption set forth in subsection (d) of this section may be rebutted by a lessor upon the showing of additional facts and circumstances to justify and validate what otherwise appears to be an unconscionable lease under this section.

"(f) Failure of a lease to contain the required number of elements specified

improperly construed § 47-210 contrary to its plain meaning, so as to not derogate the common-law doctrine of unconscionability, by requiring unconscionability claims to be evaluated based on the conditions existing in the year following the execution of the contract. Although we agree with the defendants that the trial court improperly construed § 47-210, we conclude that the defendants have not shown that the lease was presumptively unconscionable.

The following additional facts are necessary to our resolution of this claim. At trial, the defendants presented Willis Graham, the Oaks' property manager, to testify as to ground lease payments and other expenses incurred by the association. He testified that in 1995, the annual rent for the Oaks, if all 108 unit owners paid the rent due, was approximately $106,000. He also testified that, in 2000, other expenses, such as taxes, maintenance and insurance amounted to approximately $33,000. The association's budget for fiscal year 1995, which was entered into evidence, indicated that from June 1, 1994, to May 31, 1995, the Oaks had paid $94,854 in lease payments to the plaintiffs. There was no evidence indicating the amount of the monthly payments

in subsection (d) of this section shall not preclude a determination that the lease is unconscionable.

"(g) Notwithstanding any provision of the general statutes, neither the statute of limitations nor laches shall prohibit unit owners of a residential common interest community from maintaining a cause of action under this section.

"(h) If a court finds that a lease contract or lease contract clause was unconscionable at the time the contract was made, in determining whether to enforce the contract, or enforce the remainder of the contract without the unconscionable clause, or whether to limit the application of any unconscionable clause in order to avoid an unconscionable result, the court shall consider evidence regarding the adverse impact, if any, of any such determination on the interests of third parties, including lenders who may have, in good faith, relied upon such lease provisions, and the court, in formulating such a determination, shall seek to avoid an unjust impact on such third parties and shall make no such determination, the effect of which would be to terminate the common interest community."

for the prior year. The budget also indicated that the Oaks had paid $15,289 in insurance, $18,065 in real estate taxes and $4852 in capital improvements during the 1995 fiscal period. The budget did not allocate these costs between those expended for the buildings and the land, nor did it provide a monthly breakdown of the costs.

Both the plaintiffs and the defendants offered testimony relating to the value of the land underlying the Oaks, a factor used in determining unconscionability pursuant to § 47-210. The plaintiffs offered the testimony of Louis Pellegrino, a commercial real estate appraiser, who stated that the land underlying the Oaks, with improvements, was worth $750,000 as of June 1, 1995. The defendants presented Christopher Buckley, also a real estate appraiser, who testified that the same land, with improvements, was worth $576,000 as of October 1, 1994.

In its memorandum of decision, the trial court rejected the defendants' claim that the ground lease was unconscionable. It first noted that § 47-210 imposes a presumption that a ground lease is unconscionable if lease payments and other expenses exceed 15 percent of the value of the land in the twelve months prior to the filing of a claim. The court concluded, however, that, because the legislature never expressed its intent to abrogate the common-law doctrine of unconscionability, § 47-210 must be construed in a manner consistent with the common law, which evaluates unconscionability based on the conditions existing at the time the contract was executed. Therefore, the trial court construed the twelve month limitation to mean that a claim asserting unconscionability of a condominium lease must be evaluated based on the conditions existing during the twelve months following the execution of the lease. Accordingly, the trial court considered the value of the land and lease payments and other

expenses in 1982, the time at which the lease was executed. It found that the value of the land was $432,000 in 1982,[15] and that the lease payments were $34,400 per year, which was less than 15 percent of the land's value ($64,800). Additionally, the trial court considered the fact that the unit owners were not jointly and severally liable for the lease payments, but, rather, were responsible only for their individual payment. Therefore, the court concluded that, in order to prove unconscionability, each unit owner would have to show that his or her lease payments and expenses were excessive when compared with the value of the owner's interest in the condominium. Because the defendants had alleged only that the lease payments were unconscionable as to the land as a whole, and not as to the individual unit owners, the trial court concluded that they had not shown that the lease was presumptively unconscionable.

As with any issue of statutory construction, we begin with the text of the statute. Section 47-210 (a) provides in relevant part: "[T]he General Assembly finds that a combination of certain onerous obligations and circumstances warrants the establishment of a rebuttable presumption of unconscionability of certain leases, as specified in subsection (d) of this section. The presumption may be rebutted by a lessor upon the showing of additional facts and circumstances to justify and validate what otherwise appears to be an unconscionable lease under this section. Failure of a lease to contain the required number of specified elements shall not preclude a determination of unconscionability of the lease. . . ." As specified in subsection (d): "A lease entered into prior to January 1, 1984, pertaining to use of land or facilities by unit owners in a residential common

---

[15] It appears that the trial court based its valuation on evidence that the *income stream* from the lease at the Oaks was $432,000, or $4000 per unit in 1982. Our reading of the transcripts and the evidence submitted at trial indicates that the value of the land in 1982 was $486,000, or $4500 per unit.

interest community, is presumed to be unconscionable if: (1) The lease by its terms requires the lessee to pay an annual rental and other expenses that exceed fifteen per cent of the appraised value of the leased property as improved, provided for the purposes of this subdivision, 'annual rental and other expenses' means the amount paid by the lessee during the twelve months immediately preceding the filing of an action under this section as rent and for real estate taxes, insurance, capital improvements and other expenses required to maintain the property under the lease terms, and 'appraised value' means the appraised value placed upon the leased property by a licensed or certified real estate appraiser on a date during the twelve months immediately preceding the filing of an action under this section . . . ." General Statutes § 47-210 (d) (1).

The legislature's express statement in § 47-210 (a) "that a combination of certain onerous obligations and circumstances warrants the *establishment* of a rebuttable presumption of unconscionability of certain leases"; (emphasis added); indicates that the legislature intended to deviate from the common law and to establish a new statutory presumption for unconscionability claims with respect to condominium leases executed before January 1, 1984. Cf. *Spears* v. *Garcia*, supra, 263 Conn. 29 (concluding that General Statutes § 52-557n abrogates common-law doctrine of municipal immunity). Moreover, the statute sets forth the method of calculating the two relevant criteria for determining whether this presumption applies—" 'annual rental and other expenses' " and " 'appraised value' "—based on "the twelve months immediately preceding the *filing of an action* under this section . . . ." (Emphasis added.) General Statutes § 47-210 (d) (1). Therefore, a determination of unconscionability is to be made based on a certain time frame after the claim is filed, not after the contract is formed. The legislature's express creation

of a statutory presumption of unconscionability, based on certain criteria calculated by the twelve months prior to the filing of the action, clearly indicates its intention to abrogate the common-law doctrine of unconscionability for leases executed *before* January 1, 1984.

Indeed, this construction is supported by reference to other subsections of § 47-210 that address unconscionability claims for condominium leases executed *after* January 1, 1984. For leases executed after that date, the legislature codified the common-law doctrine, instructing the courts to determine whether the lease "was unconscionable *at the time the contract was made* . . . ." (Emphasis added.) General Statutes § 47-210 (b) and (h). It is a "fundamental tenet of statutory construction that [t]he use of . . . different terms . . . within the same statute suggests that the legislature acted with complete awareness of their different meanings . . . and that it intended the terms to have different meanings . . . ." (Internal quotation marks omitted.) *Hasselt* v. *Lufthansa German Airlines*, 262 Conn. 416, 426, 815 A.2d 94 (2003). The legislature's decision not to incorporate the same language of subsections (b) and (h) of § 47-210 into subsection (d), and the reference in (d) (1) to the twelve month period preceding the filing of the action, clearly indicates the legislature's intent not to apply the common-law rule to pre-1984 leases. Accordingly, the trial court improperly applied the common-law doctrine of unconscionability to the defendants' claim.

We also conclude, however, that this impropriety was harmless because the defendants introduced insufficient evidence to support their contention that the ground lease was presumptively unconscionable under § 47-210. Specifically, the defendants did not satisfy the requirements under subsection (d), because they failed to show that the annual rental and other expenses exceeded 15 percent of the appraised value of the land

for the twelve months *immediately preceding the filing of their claim*. The defendants filed their counterclaim alleging unconscionability on June 27, 1995. Therefore, under § 47-210 (d) (1), they needed to prove that the Oaks' annual rental and other expenses from June 28, 1994, to June 27, 1995, exceeded 15 percent of the appraised value of the land. The defendants offered into evidence a budget for their 1995 fiscal year, which set forth payments and other expenses from June 1, 1994, to May 31, 1995. This budget, however, did not itemize relevant expenses, such as insurance and property taxes, to indicate whether they apply solely to the land or the buildings, or to what extent they apply to both. Therefore, the record does not reflect the critical figure, namely, the expenses incurred with respect to the land during the statutorily prescribed period of the twelve months preceding the claim. Without this information, the record does not demonstrate that those costs exceeded 15 percent of the appraised value of the land.

Nonetheless, the defendants point to the undisputed testimony of Graham, the property manager of the Oaks, as proof that the relevant rents and expenses amounted to $139,276 for 1994, which the defendants claim is in excess of 24 percent of the land's appraised value, as ascertained by the defendants' appraiser, Buckley. Examination of Graham's testimony, however, reveals no such proof. Graham testified that the rent due for the Oaks in 1994 was approximately $106,000.[16] Under

---

[16] The following exchange took place between the defendants' counsel and Graham:

"Q: Mr. Graham, could you please tell the court what the annual rent, if 108 unit owners were to pay their rent in 1995, was?

"A: In 1995?

"Q: Would you like me to show you any document to assist you?

"A: I can tell you what it is right now, but I can't tell you four years ago without something in front of me.

"Q: Does it refresh your recollection to look at this?

"A: That would be $106,000."

§ 47-210 (d) (1), rent due is not the relevant figure for determining unconscionability, but, rather, the *actual* rents paid during the preceding twelve months. See footnote 14 of this opinion. The fact that $106,000 was due does not mean that it actually was paid. Moreover, Graham's testimony concerning the remaining expenses, which were approximately $33,000, pertained to those incurred in 2000,[17] not for the twelve months prior to June 27, 1995, as required by § 47-210 (d) (1). Accordingly, we conclude that Graham's testimony does not support the defendants' claim that the Oaks' ground lease was presumptively unconscionable.

## C

The defendants next contend that the trial court improperly concluded that the defendants were barred from enforcing their purchase option, because they had failed to bring an action for specific performance within the time prescribed by § 47-33a.[18] Specifically, the defen-

[17] Graham's testimony with regard to expenses other than rent, in response to questioning by the defendants' counsel, was as follows:

"Q: Mr. Graham, how much currently does the—are the annual expenses for the Oaks with respect to taxes, maintenance and insurance?

"A: The taxes for the city is $18,000 basically a year on the two buildings or on the land, I'm sorry. The portion of the insurance premium which runs about $23,000—we allot $5000 liability on the land.

"Q: And how about maintenance?

"A: Total maintenance?

"Q: Yes, annual expenses for maintenance? Do you not remember? Would it refresh your recollection if I showed you this? Look at the first page.

"A: Yes, the maintenance is approximately $10,000, that's maintaining the building, landscaping and snowblowing, etc.

"Q: So would it be correct to summarize what you just said to say that the expenses for taxes, maintenance and insurance total approximately $33,000 a year?

"A: Yes."

[18] General Statutes § 47-33a provides: "(a) No interest in real property existing under an executory agreement for the sale of real property or for the sale of an interest in real property or under an option to purchase real property shall survive longer than one year after the date provided in the agreement for the performance of it or, if the date is not so provided, longer than eighteen months after the date on which the agreement was executed, unless the interest is extended as provided herein or unless action is com-

dants claim that the time limitation was tolled by the doctrine of equitable estoppel.[19] We conclude that the trial court properly determined that the defendants' claims were not tolled by the doctrine of equitable estoppel.

The following facts are necessary to our resolution of this claim. The ground lease for the Oaks contains a purchase option that the unit owners collectively may exercise "within a twelve (12) month period which shall commence upon the ELEVENTH anniversary year of this lease . . . ." The trial court found that the defendants validly had exercised the purchase option twice

menced within the period to enforce the agreement and notice of lis pendens is filed as directed by section 52-325.

"(b) The interest may be extended only by reexecution of the written agreement or by execution of a new written agreement, provided the agreement, whether reexecuted or newly executed, shall be recorded as directed by sections 47-10 and 47-17. The period provided by this section shall not otherwise be extended, whether because of death, disability or absence from the state or for any other reason. Upon the expiration of an interest the title to property affected by the interest shall not thereafter be considered unmarketable because of the expired interest.

"(c) Nothing in this section shall be construed to limit or deny any legal or equitable rights a party may have under the agreement except the right to have the agreement specifically enforced."

[19] The defendants also assert that the trial court improperly found that they "did not validly exercise the purchase option provided in the [l]ease." Contrary to the defendants' claim, however, the trial court did find that the defendants validly had exercised their purchase option. The court concluded, however, that, despite validly having exercised the option, the defendants had failed to bring the enforcement action in a timely manner. We, therefore, need not address this claim.

In addition, the defendants claim that they are not barred from seeking other relief under § 47-33a (c). Specifically, they claim that they are entitled to "money damages . . . reformation and other relief that is proper and just under the circumstance[s]." The defendants, however, sought only specific performance as relief in their amended counterclaim. "[T]he right of a [counterclaimant] to recover is limited by the allegations of the complaint . . . and any judgment should conform to the pleadings, the issues and the prayers for relief." (Citation omitted; internal quotation marks omitted.) *Kawasaki Kisen Kaisha, Ltd.* v. *Indomar, Ltd.*, 173 Conn. 269, 272, 377 A.2d 316 (1977). We, therefore, decline to entertain this claim.

by sending a letter indicating their intention to do so—once on April 2, 1993, and again on December 16, 1993. The court further found that the plaintiffs had been evasive in their responses to the defendants' letters by refusing to express their opinion as to the timeliness of the option and indicating their view that the option could not be exercised because the rents under the ground lease were in arrears. The defendants originally, however, did not file an action thereafter seeking specific performance of the purchase option. Rather, in June of 1995, they sought, in a counterclaim to the plaintiffs' action, a declaratory judgment that they validly had exercised the option. The defendants did not seek specific performance of the purchase option until April 25, 2000, when they filed an amended counterclaim seeking such relief.

The trial court concluded that the defendants were time barred from pursuing specific performance under § 47-33a, because they had failed to file a claim within eighteen months of their exercise of the purchase option. See footnote 19 of this opinion. Specifically, the court rejected the defendants' claim that the limitation period was tolled under the doctrine of equitable estoppel due to the actions of the plaintiffs—namely, their refusal to indicate whether the option was timely and their statement that the option could not be exercised due to rents in arrears. The trial court concluded that the plaintiffs' actions did not induce the defendants to delay their enforcement action and did not create an impression that the matter could be resolved without such action. The trial court did conclude, however, that the plaintiffs had breached the covenant of good faith and fair dealing by refusing to render an opinion to the defendants as to the timeliness of the option. Accordingly, the trial court awarded the defendants damages in the amount of $3450, reflecting the additional attorney's

fees they had incurred as a result of the plaintiffs' conduct.

The defendants contend that the eighteen month limitation period under § 47-33a (a) was tolled by the doctrine of equitable estoppel. Specifically, they point to the trial court's determination that the plaintiffs had breached their duty of good faith and fair dealing for support that the limitation period should be tolled.[20]

We first set forth the standard of review and applicable legal principles that guide our resolution of this claim. "The party claiming estoppel . . . has the burden of proof. . . . Whether that burden has been met is a question of fact that will not be overturned unless it is clearly erroneous. . . . A court's determination is clearly erroneous only in cases in which the record contains no evidence to support it, or in cases in which there is evidence, but the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . The legal conclusions of the trial court will stand, however, only if they are legally and logically correct and are consistent with the facts of the case. . . . Accordingly, we will reverse the trial court's legal conclusions regarding estoppel only if they involve an erroneous application of the law." (Citations omitted; internal quotation marks omitted.) *W.* v. *W.*, 256 Conn. 657, 660–61, 779 A.2d 716 (2001).

"[I]n Connecticut, the doctrine of equitable estoppel . . . requires proof of two essential elements: [First] the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on

---

[20] The defendants claim that the trial court's finding that the plaintiffs had breached their duty of good faith and fair dealing amounts to a breach of contract, and, therefore, they were excused from further performance under the lease. Because the trial court did not address this issue in its memorandum of decision, and the defendants did not file a motion for articulation asking the trial court to do so, we decline to entertain this claim.

that belief; and [second] the other party must change its position in reliance on those facts, thereby incurring some injury." (Internal quotation marks omitted.) *Buell Industries, Inc.* v. *Greater New York Mutual Ins. Co.,* 259 Conn. 527, 547–48, 791 A.2d 489 (2002). "It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Voog,* 233 Conn. 352, 367, 659 A.2d 172 (1995).

The defendants' reliance on the trial court's finding that the plaintiffs had breached the duty of good faith and fair dealing as a basis for invoking equitable estoppel is misplaced. Although the actions of the plaintiffs caused the defendants to incur additional legal fees, equitable estoppel is concerned with actions by one party that induce a faulty reliance by the other party. There is nothing in the record to indicate that the plaintiffs misled the defendants or behaved in a manner that would have encouraged the defendants to rely to their detriment on the plaintiffs' actions or words. Moreover, the plaintiffs' failure to indicate their opinion as to the timeliness of the option does not suffice as a basis to invoke equitable estoppel as "silence will not operate as [an] estoppel absent a duty to speak." (Internal quotation marks omitted.) *Boyce* v. *Allstate Ins. Co.,* 236 Conn. 375, 387, 673 A.2d 77 (1996). We agree with the trial court that the actions of the plaintiffs "put the defendants on notice that an enforcement action was indeed necessary . . . ." The defendants cannot seek the safe harbor of equitable estoppel due to their own failure to recognize that they were required to pursue their action. "We cannot apply the doctrine of equitable estoppel in a case in which the party requesting the relief claims ignorance of the laws . . . when such

ignorance of the law is the primary cause of his need for such relief." (Internal quotation marks omitted.) *Wadia Enterprises, Inc.* v. *Hirschfeld,* 224 Conn. 240, 252 n.7, 618 A.2d 506 (1992). Accordingly, we conclude that the eighteen month limitation period under § 47-33a (a) was not tolled by the doctrine of equitable estoppel, and, therefore the trial court properly concluded that the defendants' action for specific performance was time barred.

II

We next turn to the plaintiffs' cross appeal, in which they assert two claims. They contend that the trial court improperly awarded damages to the defendants and that it improperly refused to award attorney's fees to the plaintiffs. Specifically, the plaintiffs contend that there was insufficient evidence to support a finding by the trial court that the plaintiffs had breached the duty of good faith and fair dealing, and, therefore, the trial court improperly awarded damages to the defendants on that basis. Furthermore, the plaintiffs contend that, pursuant to § 10 (b) of the ground lease, they are entitled to recover attorney's fees, and that the trial court improperly refused to award them fees under this provision. We disagree.

A

In their counterclaim, the defendants alleged that the plaintiffs had breached their duty of good faith and fair dealing by: (1) failing to convey their opinion on the purchase option period so that the defendants could exercise that option; (2) failing to obtain an appraisal to aid in negotiations over the exercise of the option; (3) failing to submit to arbitration; and (4) refusing to renegotiate the terms of the ground lease. The trial court rejected all of these claims except the first, finding that the plaintiffs' conduct had caused the defendants to incur additional legal fees. Specifically, the trial court

looked to the correspondence between the parties and found that "[t]he plaintiffs certainly had a position about when the option could be exercised, and one of the offers from the defendants was within that period. Nevertheless, the plaintiffs indicated that if the association proceeded to arbitration to fix the price, they would take the position that the exercise had not occurred during the twelve month period specified in the lease [for exercising the option], creating the prospect that the association would undergo the expense of arbitration only to find out that their exercise was either premature or late." The court concluded that this conduct had caused the defendants to incur damages, specifically, $3450 in additional legal expenses and, accordingly, awarded that sum to the defendants.

We first set forth the applicable standard of review and legal principles that guide our decision. "[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *Briggs* v. *McWeeny*, 260 Conn. 296, 322, 796 A.2d 516 (2002). "In making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 605, 799 A.2d 1027 (2002).

"It is axiomatic that the implied duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship. . . . The covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."

(Citations omitted; internal quotation marks omitted.) *Hoskins* v. *Titan Value Equities Group, Inc.*, 252 Conn. 789, 793, 749 A.2d 1144 (2000).

After reviewing the trial court's memorandum of decision and the record, we conclude that the trial court's finding that the plaintiffs had breached their duty of good faith and fair dealing was not clearly erroneous. Although the plaintiffs point to several reasons why they believed that they did not have to cooperate with the defendants—the defendants were in breach of the lease due to late rent payments, the defendants never provided an accounting and the defendants did not present appropriate notice indicating that unit owners had voted on exercising the purchase option—there is evidence in the record to support the trial court's finding. Specifically, the plaintiffs' letters stating their refusal to render an opinion on the timeliness of the option and indicating that, if the matter went to arbitration, they would assert that the options were not exercised timely, provided a sufficient basis from which the trial court could find a breach of the duty of good faith and fair dealing. We, therefore, conclude that the trial court's finding was not clearly erroneous.

B

The plaintiffs next contend that the trial court improperly failed to award them attorney's fees under § 10 (b) of the ground lease. Section 10 of the lease provides in relevant part: "[Melrose] does for itself and its successors and assigns covenant and agree with [the plaintiffs] . . . (b) That in the event the [plaintiffs] are required to employ an attorney in order to enforce a provision of this lease to pay [the plaintiffs'] reasonable attorney's fee in connection therewith. . . ."

The trial court rejected the plaintiffs' reliance on that section, construing it to mean that a "unit owner whose fractional interest in the lease is terminated because of

default of the obligation to pay his or her fractional share of rent shall pay the lessors' attorney's fees." The court found that "[t]he association is not . . . a party to the lease. Rather, the lease is a contract between the [plaintiffs] and Melrose, which assigned fractions of its rights and obligations to unit members. The individual defendants are sued in their capacity as members of the board of directors of the association, and the [plaintiffs] have not alleged that any of them is in default of any obligations as assignees of fractional interests in the lease." Accordingly, the court rejected the plaintiffs' claim for attorney's fees.

"[W]e review the trial court's decision to award attorney's fees for abuse of discretion." (Internal quotation marks omitted.) *Nagy* v. *Employees' Review Board*, 249 Conn. 693, 708, 735 A.2d 297 (1999). "There are numerous contexts in which attorney's fees may be awarded, including . . . actions on notes or other contracts with attorney's fees clauses . . . ." *Benvenuto* v. *Mahajan*, 245 Conn. 495, 502, 715 A.2d 743 (1998). "Where a contract expressly provides for the recovery of attorney's fees, an award under such a clause requires an evidentiary showing of reasonableness. . . . A trial court may rely on its own general knowledge of the trial itself to supply evidence in support of an award of attorney's fees." (Citations omitted.) *Rizzo Pool Co.* v. *Del Grosso*, 240 Conn. 58, 77, 689 A.2d 1097 (1997).

Applying these principles, and after reviewing the record, we cannot conclude that the trial court abused its discretion in denying the plaintiffs' request for attorney's fees pursuant to the lease. We agree with the trial court that § 10 (b) of the ground lease applies to actions by lessors against individual unit owners to enforce obligations under the lease. We further agree that the plaintiffs brought the present action against the members of the association's board of directors in their official capacities, not as individual unit owners. This

fact is evidenced by the nature of the claims alleged, such as the plaintiffs' claim that the defendants had been negligent in the collection of amounts due from unit owners. Under the terms of the lease, the association is not liable for the rents due the plaintiffs, and the plaintiffs do not allege that the defendants owe any back rent. Accordingly, we conclude that the trial court did not abuse its discretion by denying the plaintiffs' claim for attorney's fees.

The judgment is affirmed.

In this opinion BORDEN, NORCOTT and PALMER, Js., concurred.

ZARELLA, J., dissenting. I respectfully dissent from the majority opinion. The majority concludes that the Oaks condominium complex (Oaks) was a legally created condominium pursuant to the Condominium Act of 1976 (act), General Statutes § 47-68a et seq. More specifically, the majority concludes that, although the "act is not a model of clarity," hybrid condominiums, such as the condominium at issue in the present case, in which the purchaser is granted a fee simple interest in the building unit and a leasehold interest in the underlying land and common areas, are not inconsistent with the provisions of the act.

I disagree with the majority's analysis through which the majority seeks to determine whether a hybrid form of ownership is prohibited rather than authorized under the act. The act, however, "clearly makes compliance with its requirements a condition precedent to attaining condominium legal status . . . ." *Hall Manor Owner's Assn.* v. *West Haven*, 212 Conn. 147, 153, 561 A.2d 1373 (1989). The condominium form of ownership is a creature of statute, and, therefore, "the law mandates strict compliance with the authorizing statute." *William Beazley Co.* v. *Business Park Associates, Inc.*, 34 Conn.

App. 801, 803, 643 A.2d 1298 (1994). Thus, the test to be applied in determining whether a declaration complies with the act is not whether it is *inconsistent* with the act but, rather, whether it is *authorized* by the act. While I disagree with much of the majority's analysis,[1] I believe that the issue of whether the declaration in the present case complied with the act can be resolved by applying the foregoing principle of law with regard to the type of condominium ownership created by the declaration.

The term "property" is defined in § 47-68a (*l*) as "the land, all buildings, all improvements and structures thereon, and all easements, rights and appurtenances belonging thereto, which have been or are intended to be submitted to the provisions of [the act]." Therefore, the definition of property encompasses both land and buildings.

"Leasehold condominium" is defined in § 47-68a (cc). In substituting the definition of property, i.e., land and buildings, for the term "property" where it appears in the definition of "leasehold condominium," we derive the following definition: " 'Leasehold condominium' means [*the land and all buildings*] submitted to the provisions of th[e] [act] by the fee owner, whereby unit leases are issued for a period not less than fifty years and provided, in a residential leasehold condominium, such lease provides that the lessee shall have the option to purchase the fee simple title to the demised [*land and buildings*] during the term of the lease at a price

---

[1] For example, I find that a more reasonable reading of the statutory scheme requires that the declarant be the owner of the fee simple interest. See General Statutes § 47-70 (d); see also General Statutes § 47-71 (a) ("[t]he *owner* or *owners* of any property in the state may submit such property to the provisions of [the act]" [emphasis added]); General Statutes § 47-72 (prohibiting declarant from conveying fee simple interest or leasehold interest to purchaser with any encumbrances other than those enumerated in § 47-70, which does not include ground leases, thereby implying that declarant must be owner of fee simple interest).

stated or by a method stated for subsequent determination of the total price." (Emphasis added.) General Statutes § 47-68a (cc). This definition, I submit, clearly does not authorize the type of hybrid condominium at issue in the present case for at least two reasons.

First, the definition of "leasehold condominium" requires that "unit" leases be issued for a period of not less than fifty years. In the present case, the units[2] are owned in fee simple rather than leased. The definition of "leasehold condominium," however, requires, at a minimum, that the *unit* is leased.

Second, the definition of "leasehold condominium" requires that the lease contain an "option to purchase the fee simple title to the demised [*land and buildings*] . . . ." (Emphasis added.) General Statutes § 47-68a (cc). That provision, if not dispositive, strongly suggests that the land and buildings both must be subject to a leasehold. The lease at issue in the present case, however, provides an option to purchase the land only. Therefore, if we apply the principle that the form of ownership established by the declaration must be authorized by statute, as we should, then I conclude that the present form of ownership, under which the purchaser acquires a fee simple interest in the unit but a leasehold interest in the underlying land, *does not fall within the purview of the definition of* "leasehold condominium" contained in the act. Consequently, such form of ownership is not authorized by the act.

I also would conclude that the lease itself does not comply with the statutory requirements for establishing a leasehold condominium. The lease provides for the

---

[2] The term "unit" is defined in General Statutes § 47-68a (b) as "a part of the property including one or more rooms or designated spaces located on one or more floors or a part or parts thereof in a building, intended for any type of independent use, and with a direct exit to a public street or highway or to common elements leading to such street or highway."

exercise of an option to purchase the land during the eleventh year of the lease. It is my view that this provision conflicts with the provision of General Statutes § 47-68a (cc) that requires "that the lessee shall have the option to purchase the fee simple title to the demised property *during* the term of the lease at a price stated or by a method stated for subsequent determination of the total price." (Emphasis added.) Webster's Third New International Dictionary defines the term "during" as "throughout the continuance or course of" and "at some point in the course of . . . ." The application of those two meanings would lead to different results and, therefore, the term "during" in § 47-68a (cc) is ambiguous.

On the basis of this ambiguity, I would look to the statutory scheme to determine whether there is support for one meaning of the term "during" rather than the other, apply any applicable rules of statutory construction and review the legislative history. I also would apply common sense. I can find no statutory provision or legislative history that would provide support for either meaning. If "during," as used in § 47-68a (cc), means a single point in time, however, the failure to exercise the option to purchase would mean that no subsequent lessee would have an option to purchase the demised property as required by the act.[3] I thus would conclude that "during," as used in § 47-68a (cc), means "throughout the course of."

I also believe that the statutory requirement of an option to purchase during the term of the lease highlights the implausibility of the claim made by the plain-

---

[3] Section 47-68a (cc) requires that the lease provide that "the lessee" shall have the option to purchase the fee simple title to the demised property during the term of the lease. If we assume that the option is not exercised by the original lessee and the original lessee sells his unit to a subsequent purchaser, the subsequent purchaser, also a lessee of the land, would not have an option to purchase the leased land as required by statute.

tiff lessors that hybrid condominiums are authorized under the act. The plaintiffs claim that they can convey a leasehold interest in the land and the common elements while conveying fee simple title to the individual units. The plaintiffs further claim that the lease complies with the act as long as the lease: (1) offers the lessee an option to purchase *at a single point in time* during the course of the lease; and (2) has a minimum term of fifty years. If the lessee declines to exercise the purchase option for any reason, however, title to the unit and the land forever must remain divided, thereby making the property unmarketable—at least toward the end of the lease—and most certainly devaluing the owner's interest. This is an untenable proposition.

According to the condominium ground lease in the present case, the leased property includes not only all of the land but "all improvements lying upon or under the surface of the land and not contained in the [b]uilding, including without limitation sewers and sewer connections and paving lying upon the land . . . ." When the leasehold expires, the land and all improvements revert to the declarant unencumbered by the obligations of the lease. Title to the buildings remains with the unit purchaser without the enjoyment of any of the rights under the lease. The lease in the present case, quite remarkably, does not explain or otherwise describe what happens upon its expiration, another fact that serves to confirm its unconscionability, as I discuss later in this opinion. Accordingly, if hybrid condominiums are authorized under the act, as the majority so concludes, then the term "during" in § 47-68a (cc) can only reasonably mean "throughout the continuance or course of" the lease.[4] The attribution of this meaning to the term "during," in turn, would render the lease nonconforming with respect to the provisions of the

---

[4] This would, at a minimum, allow for unit owners to exercise the option to purchase the land as the end of the lease approaches.

act. If hybrid condominiums are not permitted under the act, however, then the declaration would contravene the provisions of the act. Either way, it appears that the plaintiffs should not prevail on appeal.

A determination that a hybrid condominium is not authorized under the act or that the lease contravenes the provisions of the act also implicates the issue of unconscionability. With respect to the trial court's conclusion that the lease was not unconscionable, I first note that that court properly recognized that the determination of whether a lease is unconscionable must be made with due consideration of common-law principles of unconscionability. Furthermore, this court long has stated that the policy of this state is not to uphold restraints on the alienation of real property. E.g., *Peiter* v. *Degenring*, 136 Conn. 331, 336, 71 A.2d 87 (1949). "It is undisputable that [i]t is the policy of the law not to uphold restrictions upon the free and unrestricted alienation of property unless they serve a legal and useful purpose. [Id.] It also is undisputable that this policy is strong and deeply rooted. J. Dukeminier & J. Krier, Property (3d Ed. 1993) p. 223 ([t]he rule against direct restraints on alienation is an old one, going back to the fifteenth century or perhaps even earlier). Moreover, it is undisputable that the right of property owners to rent their real estate is one of the bundle of rights that . . . constitute[s] the essence of ownership of property. See, e.g., id., p. 86 ([property] consists of a number of disparate rights, a bundle of them: the right to possess, the right to use, the right to exclude, the right to transfer). The question . . . therefore, is whether . . . the continued maintenance of [a restriction on the alienation of property] serves a legal and useful purpose." (Internal quotation marks omitted.) *Gangemi* v. *Zoning Board of Appeals*, 255 Conn. 143, 151, 763 A.2d 1011 (2001). Because the termination of the leasehold in this case directly affects the unit own-

ers' ability to possess and use the building, this fact certainly should be a consideration in determining the unconscionability of the lease.

Additionally, when the lease terminates without the exercise of the option to purchase the land, a question arises about whether the lack of terms in the lease regarding the relationship of the parties with respect to the use of the building would lead to economic waste. We also have recognized a public policy against such waste. E.g., id., 154.

Finally, I do not agree with the majority that § 47-68a (cc) authorizes the collective exercise by all of the unit owners of the option to purchase as the lease in the present case requires. Rather, I interpret the statute to require lessors to give each lessee a separate and individual right to exercise an option to purchase. I again would consider this factor in determining whether the lease is unconscionable.

I therefore would determine that hybrid leasehold condominiums are not authorized under the act and that the declaration at issue in the present case did not create a valid condominium. Furthermore, I would conclude that the purchase option in the lease, as written, is invalid because it fails to comply with the provision of § 47-68a (cc) that requires that the lessee's option to purchase be exercisable at all times during the term of the lease. Accordingly, I would reverse the judgment of the trial court and remand the case for a new trial on all unresolved issues, including the issue of the unconscionability of the lease. Furthermore, a determination of whether the lease is unconscionable should be made with due consideration of the fact that hybrid condominiums are not authorized under the act, the fact that the lease does not conform to the dictates of § 47-68a (cc), and public policy considerations.

Accordingly, I respectfully dissent.